### CHMIELEWSKI *v.* NAU.

1. APPEAL AND ERROR—DE NOVO REVIEW.

A suit to rescind an agreement to purchase a going grocery business, being a chancery case, is tried *de novo* by the Supreme Court.

2. FRAUD—MAKING AND RELIANCE ON REPRESENTATIONS.

Finding of the trial court that clause in an agreement for the sale and purchase of grocery and meat business that if the store took in $3,500 during the "trial week" at which the purchaser himself was to be present, all idea and claim that plaintiff relied upon the representations of the sellers were negatived *held,* not supportable in suit to rescind such agreement for fraud, where the agreement also provided that the "terms, conditions and representations in the listing contract * * * are hereby made a part of this agreement for sale and purchase and binding" on the sellers.

REFERENCES FOR POINTS IN HEADNOTES

[1] 2 Am Jur., Appeal and Error, § 2; 3 Am. Jur., Appeal and Error, §§ 814, 815; 46 Am. Jur., Sales, §§ 771, 772.
[4] 46 Am. Jur., Sales, § 773.
[4] Time for rescission by purchaser of chattel for fraud or breach of warranty.   72 A.L.R. 726.
[5] 46 Am. Jur., Sales, § 772.
[5] Fraud: Necessity for knowledge of falsity of representation as to value, inducing subscription to or purchase of corporate stock, or other securities.   73 A.L.R. 1120.

3. Same—Reliance on Two Representations.

The seller's agreement that a trial week would produce a showing of $3,500 gross receipts of grocery and meat business and that the business had averaged $3,500 a week while the sellers had operated it *held*, material and contemporaneous representations of seller in purchaser's suit to rescind because of fraud, and fact that trial week receipts were as claimed would not bar purchaser from rescinding because of falsity of representations as to average over period of time of seller's operation of the business.

4. Same—Discovery—Rescission—Change of Situation.

In buyer's suit to rescind contract for purchase of grocery and meat business, evidence *held,* to show that promptly after he discovered the falsity of seller's representations as to amount of average business that he proceeded to rescind the contract without any intervening change of situation of the parties.

5. Same—Rescission—Reduction of Inventory—Advancement of Rent.

In suit for rescission of contract for purchase of grocery and meat business for fraud, where plaintiff is found entitled to return of deposit made, such deposit is reduced by the amount of reduction in inventory and amount seller had advanced on the lease, but seller is not entitled to repayment of commission paid the real estate agent who brought the parties together.

Appeal from Wayne; Richter (Theodore J.), J. Submitted January 12, 1949. (Docket No. 54, Calendar No. 44,305.) Decided April 11, 1949.

Bill by John Chmielewski against Walter Nau and Velma Nau to rescind the sale of a grocery and meat market. Decree for defendants. Plaintiff appeals. Reversed and decree entered for plaintiff.

*Sempliner, Dewey, Stanton & Honigman* (*Milton J. Miller* and *Jason L. Honigman,* of counsel), for plaintiff.

*Paul Bairas* (*Ralph L. Seltzer,* of counsel), for defendants.

REID, J. Plaintiff filed his bill of complaint in this case for rescission, on the ground of alleged fraud, of a purchase by him from the defendants of a going grocery business.

This being a chancery case, we try the case *de novo*.

Defendants Walter Nau and Velma Nau in October, 1946, equipped and from that time on operated a grocery and meat market at 20505 Grand River avenue in Detroit, Michigan. On September 8, 1947, they sold the grocery and meat market to plaintiff for $21,000 plus the value of the stock at inventory at the time of sale, receiving $10,000 down, with the balance to be on time. The agreed value of the stock of merchandise was $5,264.49.

Defendants had first listed their grocery and meat market business for sale in July, 1947, with Robert Anderson, a duly licensed real estate broker, reciting in the listing agreement, "Income $4000 a wk." Defendant Walter Nau, hereinafter referred to as defendant, claims he recomputed the sales total and informed Anderson that the store did $3,500 a week business. Defendant directed Mr. Anderson to drop the figure from $4,000 to $3,500 and stated to Mr. Anderson absolutely that the store was doing at least that much business. At defendant's request, Anderson put an advertisement in the Detroit News, Sunday, August 10, 1947, reading in part, "Grocery, Meat—$3,500 weekly."

Plaintiff testified that in response to the ad which recited the $3,500 weekly sales, plaintiff went to see Anderson, who introduced plaintiff to defendant. Plaintiff testified as follows respecting a conversation he said he had with defendant in the back of the store in the presence of Anderson:

"I said, 'How much business do you do in this store here a week?' and he said, '$3,500 right now,

and we made as high as $5,000.' And I said, 'Could you prove it with books, in case I want to see the books?' And he says, 'Yes, we got the records to prove it.' This took place in August, 1947."

In consequence of plaintiff's looking the business over, and the representations made to plaintiff by defendant, a contract of sale, exhibit No. 2, was entered into, dated August 26, 1947, for the purchase of the grocery-meat-beer-wine business of defendants, known as "Sno-White Food Market," for the price hereinbefore recited, the agreement containing the following among other things:

"It is further agreed that second party [plaintiff] shall have the right to a week's trial of above business from September 2, 1947 to September 8, 1947, and if the business does not average $3,500, then deposit above mentioned to be returned to second party. Party of second part has been accepted by the landlord of above mentioned premises. * * *

"It is hereby understood that all the terms, conditions, and representations in the listing contract executed and signed by the said parties of the first part prior to this agreement is [are] hereby made a part of this agreement for sale and purchase and binding on the said parties of the first part."

The testimony showed that following the signing of this agreement, plaintiff was in and about the store during the entire trial week to take readings from the cash register, and saw what kind of business was being done. There was testimony that the store did $3,700 worth of business during the trial week, and though plaintiff desires to draw an inference that some possibly underhanded work was carried out by defendants resulting in an incorrect and exaggerated report of the total at $3,700, yet there is no definite testimony that the total amount of business for the trial week was in fact any less than the $3,700 testified to by defendant. After the trial

week, and after having examined into the actual status of the business but without opportunity to examine the books showing actual amount of previous business, plaintiff closed the deal upon the terms set forth in exhibit No. 2 above referred to. Upon the conclusion of the deal, plaintiff took over the operation of the grocery and meat market, received in the business very much less than $3,000 a week, and now seeks to rescind on the ground of fraud.

The sales tax record of the defendants shows that there was not an average weekly gross income of $3,500 during any month that defendants operated the store, and that the average gross weekly receipts during the defendants' operation was $2,899.

Defendant does not deny that he overstated the income of the business. Defendant, however, claims that plaintiff did not accept defendant's statement for the amount of business, but looked into the whole matter himself, examined the books of the company, insisted upon the one-week trial, saw for himself the results of the one-week trial, and that plaintiff relied upon his own observation and not the false statements of defendant to prove that the business was profitable and that it was desirable for plaintiff to close the deal on the terms on which he did close it.

The trial court found that the clause in the agreement for sale and purchase, exhibit No. 2, which specified that unless the store took in $3,500 during the "trial week," at which plaintiff himself was to be present, negatived all idea and claim that plaintiff relied upon the representations of the defendant, in which finding we cannot concur. Such finding overlooks entirely the second clause above quoted from the contract, in which clause it is recited that the representations in the listing contract are made a part of the agreement. The representations are

just as much a part of the agreement as the clause pertaining to the trial week.

There was a dispute in the testimony over the identity of the listing agreement. The witness, agent Anderson, who acted as sales agent for defendants Nau, testified that there never was any listing agreement other than the original agreement produced on the trial, marked exhibit 1-A and 1-B. As above noted, that part of the listing agreement which is marked exhibit 1-B contains the statement among other things, "Income $4000 a wk." Mr. Anderson testified that defendant asked him to destroy the original listing agreement and substitute another listing agreement therefor, which Anderson refused to do. Defendant testified:

"I sent that second listing agreement to him some time in July. That second listing agreement recited that our business was doing $3,500 a week business."

We find exhibit 1-A and 1-B to be the listing agreement referred to in the sales agreement.

We construe the sales agreement to be an absolute warranty on the part of defendants Nau that the business should show $3,500 during the trial week and that defendants Nau undertook and bound themselves not only to permit to plaintiff the benefit of a trial week, but also made the representations in the listing agreement a part of the agreement in question with a verbal modification agreed to by the parties that the average income was $3,500 instead of the $4,000 recited in the listing agreement, exhibit 1-A and 1-B. The words "average $3,500" could scarcely refer to the trial week only. There would be no weekly "average" for just one week.

In view of all the circumstances shown in the testimony, we construe the clause in question in the sales agreement to mean that the sales during the trial week would be at least $3,500, which the de-

fendants Nau guaranteed was the average during the period of their operation of the store.

The defendants Nau by their sales agreement among other things guaranteed these two things: First, that the gross receipts of the trial week should be at least $3,500; second, that the business during the operation of it by defendants Nau had averaged $3,500 a week. The two undertakings were material and contemporaneous. Plaintiff had a right to rely upon both. Defendants fulfilled as to the first part of their agreement that the income should be $3,500 during the trial week, but as to the second part of their agreement that the business had averaged that amount during the past period of operation by defendants, the defendants failed to comply with their guarantee.

We conclude the trial court was in error in considering that the results of the trial week and the fact that plaintiff availed himself of such results, had the effect of barring plaintiff from claiming a right to rescind because of the falsity of the representations that had theretofore been made to plaintiff. The accuracy of those representations is guaranteed by the sales agreement.

We come to an important question, further, of when plaintiff found out that those representations were in fact false. It clearly appears that for a time the books of the business were not shown by defendants Nau to plaintiff, and the question arises as to just exactly when plaintiff had such a full opportunity to look into the books and determine therefrom the receipts of the business, and whether he is to be considered to have waived his claim to having been defrauded by anything he did after he found out what the books really showed.

There is a confusion in the testimony as to when the books were finally permitted to be examined by the plaintiff. Plaintiff testified:

"I was not shown Mr. Nau's books and records before I purchased the store. I asked for them, but Mr. Nau always said that he either was to his cottage or he couldn't get hold of the bookkeeper, and he says, 'As soon as I get hold of the bookkeeper, I will give you all the records you want.'"

Plaintiff testified that he had a discussion with Mr. Nau about the second or third day after taking over the store; that Nau asked plaintiff how the business was and that plaintiff replied it was slow; that Nau replied that it was always busy when he was there; that plaintiff said it didn't look to him like the store would make $3,500 a week; that Nau replied, "We always made it;" that after 5 or 7 days, plaintiff having had trouble regarding the lease for the store, Mr. Nau and Anderson came into the back of the store and asked plaintiff, "How about you signing your lease with the owner;" that thereupon plaintiff demanded that Nau give him the records of the store so he (plaintiff) could determine whether he really wanted a lease, that he no longer believed Nau; that Nau said plaintiff had no right to ask for the records because the deal was closed and that if plaintiff did not sign the lease, the owner would throw him out.

Plaintiff further testified that his wife persuaded him to agree to sign the lease and that Nau later produced the records of the business, except the portions for 3 months' business for the preceding summer, which plaintiff never received.

Plaintiff further testified his gross sales for 6 weeks ran respectively in order of time, $1,458.61, $1,576.19, $1,782.74, $1,559.45, $1,474.06 and $1,430.69.

Defendants' agent Anderson testified that there were 2 or 3 months' records missing from the records produced for plaintiff by defendant. This was apparently at a time when an extension of the lease had become necessary, which was a few days after the deal was closed.

While defendant testified he showed the books to plaintiff before he closed the deal, he seems to have qualified that statement while testifying before Judge Jayne (apparently on pre-trial) by saying, "I *think* before we closed the deal" (italics supplied).

We conclude that plaintiff was refused by defendant access to the sales records before closing the deal, and that plaintiff closed the deal without sufficient information to enable him to discover the falsity of defendant's representations as to average receipts of $3,500 per week; that promptly after discovery of the true situation, there having been no intervening change of situation of the parties to prevent rescission, plaintiff moved to rescind.

When plaintiff found out the falsity of the representations he still had a right, in view of the nature of the purchase agreement, to rescind. We recognize the right of plaintiff to rescind under the circumstances of this case.

The testimony showed a decrease in the inventory of the assets of $2,522.54, deducting which decrease from the $10,000 paid by plaintiff leaves the amount due plaintiff, $7,477.46. From such residue, however, plaintiff apparently should repay $500 advanced on the lease. Thus defendants are required to repay plaintiff a net balance of $6,977.46. Defendants under the circumstances of this case are not entitled to have the commission fee they paid Anderson repaid to them by plaintiff.

The trial court entered a decree dismissing the bill, which decree is reversed. A decree will be entered in this Court in accordance with this opinion. Costs to plaintiff.

SHARPE, C. J., and BUSHNELL, BOYLES, NORTH, DETHMERS, BUTZEL, and CARR, JJ., concurred.